

# The University of the State of New York

### The State Education Department
#### State Review Officer
www.sro.nysed.gov

No. 12-047

**Application of a STUDENT WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the New York City Department of Education**

**Appearances:**

Mayerson & Associates, attorneys for petitioners, Gary S. Mayerson, Esq., of counsel

Michael Best, Special Assistant Corporation Counsel, attorney for petitioner, G. Christopher Harriss, of counsel

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law. Petitioners (the parents) appeal from the decision of an impartial hearing officer (IHO) which denied their request to be reimbursed for their son's tuition costs at the McCarton School (McCarton) for the 2010-11 school year. The appeal must be dismissed.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a school district representative (Educ. Law. § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]). If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; 34 CFR 300.151-300.152, 300.506, 300.511; Educ. Law § 4404[1]; 8 NYCRR 200.5[h]-[l]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the

identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2],[c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings conclusions and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.514[c]; 8 NYCRR 200.5[k][2]).

### III. Facts and Procedural History

The student has received a diagnosis of autism and attended McCarton since 2004 (Tr. p. 627; see District Ex. 3).[1] McCarton has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7).

On May 19, 2011, the CSE convened to conduct the student's annual review and to develop his 2011-12 IEP (Dist. Ex. 1). For the 2011-12 school year, the CSE recommended that the student be placed in a 12-month 6:1+1 special class in a specialized school and receive full-time 1:1 behavior management paraprofessional, counseling, speech-language, and occupational therapy (OT) services (Dist. Ex. 1 at pp. 1, 26).

---

[1] The student's eligibility for special education and related services as a student with autism is not in dispute in this proceeding (Tr. p. 195; Parent Ex. A; see 34 CFR 300.8 [c][1]; 8 NYCRR 200.1[zz][1]).

On June 6, 2011, the student's father signed an enrollment contract with McCarton for the 2011-12 school year, beginning on July 5, 2011 (Parent Ex. PP; see Parent Exs. QQ; RR).[2]

In a letter to the district dated June 15, 2011, the parents advised, among other things, that they had not yet received the May 2011 IEP or a final notice of recommendation (FNR) for the student and that the student would continue to attend McCarton for the 2011-12 12-month school year, unless the district offered an appropriate program and placement (Dist. Ex. 21). The letter also indicated that the parents would seek reimbursement for the student's tuition at McCarton, as well as transportation and seven hours per week of "1:1 home and community [applied behavior analysis] ABA services" (id.). In an FNR to the parents dated June 15, 2011, the district summarized the May 2011 CSE's recommendations and notified the parents of the particular school to which the student was assigned for the 2011-12 school year (Parent Ex. I). In a letter to the district dated June 24, 2011 the student's mother advised that she had visited the particular public school identified by the district in its June 15, 2011 FNR and that she was rejecting the district's program on the grounds that it was inappropriate to meet the student's needs (Dist. Ex. 22). The parent further indicated that the student would continue to attend McCarton for the 2011-12 12-month school year and that she would seek payment of the student's tuition costs from the district, among other things (id.).

**A. Due Process Complaint Notice**

In an amended due process complaint notice dated July 27, 2011[3] the parents sought an impartial hearing, requesting as relief, payment of the student's tuition costs from the district for McCarton for the 2011-12 school year, among other things (Parent Ex. A at p. 8). The parents asserted that the district deprived the student of a free appropriate public education (FAPE) for the 2011-12 school year, that McCarton was appropriate for the student's educational needs, and that equitable considerations supported their claim for relief (id. at pp. 1-2). The parents asserted 73 numbered claims including, among other things, that: the May 2011 CSE engaged in impermissible predetermination, precluding meaningful participation of the parents and other CSE members; the program recommended by the May 2011 CSE was not reasonably calculated to provide the student with meaningful educational benefits; the student's May 2011 IEP did not adequately address the student's need for 1:1 support, including 1:1 "teaching" support throughout the school day; the district failed to develop a transition plan; the district failed to conduct an appropriate functional behavioral assessment (FBA) and develop an appropriate behavioral intervention plan (BIP); the IEP failed to offer parent counseling and training; the May 2011 CSE failed to discuss a specific educational placement location for the student; the May 2011 CSE failed to provide a copy of the IEP to the parents at the conclusion of the CSE meeting; the assigned school was not reasonably calculated to meet the student's needs; the functioning levels of the students at the assigned school were inappropriate for the student; the assigned school lacked a sensory gym; and the district was not able to fulfill the student's related services mandates at the assigned school (id. at pp. 2-8).

---

[2] Although the enrollment contract with McCarton appears to have been prepared on or about April 19, 2011, it was signed on June 6, 2011 (compare Parent Ex. PP at p. 1, with Parent Ex. PP at p. 3).

[3] The parents' original due process complaint notice was dated June 30, 2011 (Parent Ex. B).

### B. Impartial Hearing Officer Decision

An impartial hearing convened on September 23, 2011[4] and concluded on December 22, 2011, after five days of proceedings (Tr. pp. 1-673). In a decision dated January 30, 2012, the IHO found that the parents' assertion that the program recommended by the CSE was predetermined was not supported by the evidence; that the annual goals were reviewed and discussed at the CSE meeting specific to the student and based upon deficits noted in the IEP; that the absence of an FBA did not require a finding that a FAPE was not provided where the IEP adequately addressed the student's behaviors; that the BIP was sufficient; that the absence in the IEP of a written transition plan for moving to a new placement was not a basis for concluding that a FAPE had not been offered; that the district may issue related services authorizations (RSAs) to satisfy its obligation to provide related services and that persuasive evidence showed that the student's related service mandates could have been fulfilled at the assigned school either directly or through RSAs; that the lack of a school placement on the student's IEP did not constitute a denial of a FAPE; that the failure to specify parent counseling and training on the IEP did not constitute a denial of FAPE, noting that parent counseling and training were programmatic and that the parents were informed at the CSE meeting that parent training would have been provided; that the date of the district's classroom observation did not result in a denial of a FAPE; that the delayed receipt of the IEP did not result in a denial of FAPE or interfere with the parents' meaningful participation in the CSE process where the IEP was received before the beginning of the school year; and that the CSE was properly constituted (IHO Decision at pp. 15-18).

The IHO next found that the district established the offered 6:1+1 special class placement with a 1:1 paraprofessional was "reasonably calculated to enable meaningful gains" (IHO Decision at p. 20).[5] In addition, the IHO found, as to the parents' assertion that the student required ABA instruction and the IEP should have provided for it, the CSE was not required to specify methodology on an IEP but rather methodology was left to instructional staff (id. at p. 19). As to the parents' claim that the 1:1 support that the student would have received in the district's program was inadequate to meet his needs, the IHO found that the student would have had a full-time 1:1 behavior management paraprofessional and that persuasive testimony indicated how 1:1 instruction may be provided in a classroom by the teacher as needed with reinforcement by a paraprofessional (id.). Regarding the parents' claim that the annual goals in the IEP were "structured in contemplation of 1:1 ABA and [were] not otherwise appropriate," the IHO found that the goals were appropriate with the program proposed by the district, and were

---

[4] An impartial hearing regarding the student's pendency (stay put) placement was conducted on September 23, 2011 (Tr. pp. 7-11). The parents asserted the student's pendency placement arose from a prior IHO Decision dated August 18, 2011 and the district did not oppose the parents' request (Tr. pp. 9-11). In an interim order on pendency dated October 11, 2011, the IHO issued an order in conformity with the parents' and district's agreement (Interim IHO Decision at p. 2).

[5] While the meaning of the IHO's decision was clear, she used the term "program" to describe the type of educational setting or placement on the continuum of alternative placements recommended for the student by the CSE and "placement" to describe the particular school building to which the district assigned the student (IHO Decision at p. 20). However as further described below, in this decision I have used the terms as employed by the IDEA and its implementing regulations, reviewing courts, and the Office of Special Education (see Placements, 71 Fed. Reg. 46588 [August 14, 2006]; T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 419-20 [2d Cir.2009], cert. denied, 130 S. Ct. 3277 [2010]; "Questions and Answers on Individualized Education Program (IEP) Development, The State's Model IEP Form and Related Documents," at pp. 26-27, available at http://www.p12.nysed.gov/specialed/formsnotices/IEP/training/QA-411.pdf).

aligned with the student's identified needs and skill deficits, and that they were not dependent upon methodology (id. at p. 20). The IHO also found that a transition plan is not required on an IEP and that the 1:1 paraprofessional would have helped the student transition from McCarton to the district's program (id.).

Regarding the assigned school, the IHO found that the district had a space available for the student in the recommended school on the first day of the school year, and that the assigned school was appropriate for the two month summer program and for the remainder of the school year (IHO Decision at p. 20). Regarding classroom configurations for the part of the program beginning September 2011, the IHO found that the district was not required to present evidence as to staffing or student functioning, as such would be speculative because the student had not attended the assigned school (id. at p. 21). As to the summer program, the IHO concluded that the student would have been appropriately grouped and that the classroom was adequately staffed (id.). Accordingly, the IHO found that the district established that the IEP was properly developed and that the program and placement it offered was reasonably calculated to enable the student to make meaningful educational gains; therefore, the district offered the student a FAPE (id.).[6]

## IV. Appeal for State-Level Review

In a petition, the parents assert that the IHO erred in finding that the district established it offered the student a FAPE. In support of their claim, the parents assert, among other things, that the student's mother was not given a copy of the student's IEP at the May 2011 CSE meeting and the IEP was not mailed to the parents until June 28, 2011; the district did not conduct an FBA before generating a BIP; the BIP was generated by the district without participation of the parents and was insufficient; the district's FNR was conducted without parental input or discussion as to school selection; despite the student's problems with "transition," the district did not develop a transition plan; there was no provision in the IEP for parent counseling and training; the summer 2011 program would have been significantly different from the September 2011 program; and although the district was proposing that the student move from an ABA-based program to a Treatment and Education of Autistic and related Communication handicapped Children (TEACCH)-based program, the district did not assess the student to see if TEACCH was effective. Regarding the assigned school, the parents allege that the did not offer the 1:1 instruction and behavioral support the student required; the district did not check to see if the assigned school would be able to fulfill the student's related services mandates; the functional and age groupings of the students in the assigned class were inappropriate; the IHO erred in finding the district was not required to present evidence regarding the student's classroom configurations beginning in September 2011; the IHO erred in finding that regarding the summer program, the student would have been appropriately grouped; and the student's sensory needs could not have been met at the assigned school.

_____

[6]Given the number of allegations asserted in the due process complaint notice, I note that the IHO's decision did not address every allegation (compare Parent Ex. A at pp. 1-8, with IHO Decision at pp. 13-21). I also note that the IHO indicated that she addressed the claims that did not appear to have been abandoned by the parents (see IHO Decision at p. 14). As a number of the enumerated allegations in the due process complaint notice were overlapping and even duplicative in some instances, I remind the IHO that State regulations set forth provisions for conducting a prehearing conference to simplify or clarify the issues that will be addressed in an impartial hearing (8 NYCRR 200.5[j][3][xi][a]) in order to determine which issues need to be addressed in the IHO's decision.

In an answer, the district asserts that the parents' petition must be dismissed for failure to include the notice with petition with the verified petition as required by State regulation.[7] The district also asserts that the parents' memorandum of law lacks a table of contents in violation of State regulation.[8] In addition, the district asserts that the IHO correctly determined the district offered the student a FAPE for the 2011-12 school year. The district asserts that the May 2011 IEP was developed in a procedurally appropriate manner and was reasonably calculated to confer meaningful educational benefits to the student. In addition, the district asserts that, although the parents' claims regarding the assigned school are speculative because the student did not attend the assigned school for the 2011-12 school year, the school would have been able to appropriately implement the student's IEP, and the district was not required to keep a seat available for the student after the parents rejected the school on or about June 24, 2011. In addition, the district asserts that the parents' objection to the FBA is without merit as the student's BIP was produced using information from the student's then-current providers at McCarton; that the parents' arguments regarding methodology are without merit; the district's recommended program would have provided the student with appropriate instruction including 1:1 instruction; that no requirement exists under the IDEA for a transition plan for a student transitioning to a public school; that the parents' argument concerning the district's provision of related services was speculative and without merit; and that the student would have been appropriately grouped in the assigned school. Moreover, the district asserts that the parents' complaints about the assigned school's purported lack of sensory equipment, the absence of parent counseling and training on the IEP, and an inappropriate BIP are factually and legally without merit. The district also asserts that the parents' claims regarding the process by which the assigned school was recommended and the lack of parent participation in the generation of the IEP are also without merit. In addition, the district asserts that the parents failed to establish that McCarton was an appropriate placement for the student for the 2011-12 school year, and that equitable considerations favor the district.

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove v. T.A., 129 S. Ct. 2484, 2491 [2009]; Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]).

---

[7] To initiate an appeal, a parent must serve a notice of intention to seek review and subsequently, a notice with petition, petition, memorandum of law and any additional documentary evidence must be served upon the respondent within 35 days from the date of the decision sought to be reviewed (8 NYCRR 279.2[b], 279.3). Here, the parent did not serve a notice with petition. However, the district answered the parents' allegations in this case in a timely manner. Under the circumstances, I decline to dismiss the petition for the failure to serve the notice with petition (see Application of a Student Suspected of Having a Disability, Appeal No. 09-132; Application of a Child with a Disability, Appeal No. 07-117); however, I remind the parents and their counsel to adhere to the State regulations in future appeals.

[8] I note that the parents' memorandum of law does not fully comply with the practice regulations (see 8 NYCRR 279.8[a][6]). In the exercise of my discretion, I decline to reject the parents' memorandum of law (8 NYCRR 279.8[a]). However, I once again remind the parents and their counsel to ensure compliance with the State regulations in future appeals.

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). While school districts are required to comply with all IDEA procedures, not all procedural errors render an IEP legally inadequate under the IDEA (A.C. v. Bd. of Educ., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]; Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10 [S.D.N.Y. Feb. 9, 2007]). Under the IDEA, if a procedural violation is alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 525-26 [2007]; A.H. v. Dep't of Educ., 2010 WL 3242234, at *2 [2d Cir. Aug. 16, 2010]; E.H. v. Bd. of Educ., 2008 WL 3930028, at *7 [N.D.N.Y. Aug. 21, 2008]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007] aff'd, 2008 WL 3852180 [2d Cir. Aug. 19, 2008]).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (Rowley, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 130 [2d Cir. 1998]; see Rowley, 458 U.S. at 189). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (Walczak, 142 F.3d at 132, quoting Tucker v. Bay Shore Union Free Sch. Dist., 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; see Grim, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (Rowley, 458 U.S. at 189, 199; Grim, 346 F.3d at 379; Walczak, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student an opportunity greater than mere 'trivial advancement'" (Cerra, 427 F.3d at 195, quoting Walczak, 142 F.3d at 130 [citations omitted]; see P. v. Newington Bd. of Educ., 546 F.3d 111, 118-19 [2d Cir. 2008]; Perricelli, 2007 WL 465211, at *15). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 [2d Cir. 1997]; see Rowley, 458 U.S. at 192). The student's recommended program must also be provided in the least restrictive environment (LRE) (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; see Newington, 546 F.3d at 114; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 108 [2d Cir. 2007]; Walczak, 142 F.3d at 132; E.G. v. City Sch. Dist. of New Rochelle, 606 F. Supp. 2d 384, 388 [S.D.N.Y. 2009]; Patskin v. Bd. of Educ., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (see 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]; Tarlowe v. Dep't of Educ., 2008 WL 2736027, at *6 [S.D.N.Y. July 3, 2008] [noting that a CSE must consider, among other things, the "results of the initial evaluation or most recent evaluation" of the student, as well as the "'academic,

developmental, and functional needs'" of the student]), establishes annual goals designed to meet the student's needs resulting from the student's disability enabling him or her to make progress in the general education curriculum (see 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (see 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]; see Application of the Dep't of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 06-059; Application of the Dep't of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9).

        A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]). In Burlington, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 111 [2d Cir. 2007]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (Burlington, 471 U.S. at 370-71; see 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

        The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see M.P.G. v. New York City Dep't of Educ., 2010 WL 3398256, at *7 [S.D.N.Y. Aug. 27, 2010]).

## VI. Discussion

### A. May 2011 CSE Process — Parent Participation

        The IDEA sets forth procedural safeguards that include providing parents an opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child" (20 U.S.C. § 1415[b][1]). Federal and State regulations governing parental participation require that school districts take steps to ensure that parents are present at their child's IEP meetings or are afforded the opportunity to participate (34 CFR 300.322; 8 NYCRR 200.5[d]). Although school districts must provide an opportunity for parents to participate in the development of their child's IEP, mere parental disagreement with a school district's proposed IEP and placement recommendation does not amount to a denial of meaningful participation (see P.K. v. Bedford Cent. Sch. Dist., 569 F. Supp. 2d 371, 383 [S.D.N.Y. 2008] ["A professional disagreement is not an IDEA violation"]; Sch. for Language and Communication Development v. New York State Dep't of Educ., 2006 WL 2792754, at *7 [E.D.N.Y. Sept. 26, 2006] ["Meaningful participation does not require deferral to parent choice"]; Paolella v. District of Columbia, 2006 WL 3697318, at *1 [D.C. Cir. Dec. 6, 2006]). The consideration of possible recommendations for a student, prior to a CSE meeting is not prohibited as long as the CSE understands that changes may occur at the CSE meeting (see T.P.

v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]; Nack v. Orange City Sch. Dist., 454 F.3d 604, 610 [6th Cir. 2006] ["predetermination is not synonymous with preparation"]; Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 857-60 [6th Cir. 2004]; B.O. v. Cold Spring Harbor Cent. Sch. Dist., 807 F. Supp. 2d 130, 136 [E.D.N.Y., 2011]; A.G. v. Frieden, 2009 WL 806832, at *7 [S.D.N.Y. Mar. 26, 2009]; P.K., 569 F. Supp. 2d at 382-83; Danielle G. v. New York City Dep't of Educ., 2008 WL 3286579, at *6-*7 [E.D.N.Y. 2008]; M.M. v. New York City Dep't of Educ., 583 F. Supp. 2d 498, 507 [S.D.N.Y. 2008]; W.S. v. Rye City Sch. Dist., 454 F. Supp. 2d 134, 147-48 [S.D.N.Y. 2006]; Application of the Dep't of Educ., Appeal No. 11-051; Application of the Dep't of Educ., Appeal No. 10-070; see also 34 CFR 300.501[b][1], [3]; 8 NYCRR 200.5[d][1], [2]). A key factor with regard to predetermination is whether the district has "an open mind as to the content of [the student's] IEP" (T.P., 554 F.3d at 253; see M.R. v. Scarsdale Union Free Sch. Dist., 615 F. Supp. 2d 283, 294 [S.D.N.Y. 2009]).

To the extent that the parents' allegation that the district's failure to furnish them with a copy of the resultant IEP and CSE minutes at the conclusion of the May 2011 CSE meeting indicates that the parents were not afforded a meaningful opportunity to participate in the CSE process, the IDEA does not require parental presence during the actual drafting of the written education program document (E.G., 606 F. Supp. 2d 384 at 388-89). Moreover, there is no legal authority requiring districts to produce an IEP or CSE minutes at the time that the parents demand, districts must only ensure that a student's IEP is in effect by the beginning of the school and that the parents are provided a copy (J.G. v. Briarcliff Manor Union Free School Dist., 682 F. Supp. 2d 387, 396 [S.D.N.Y. 2010]).[9]

In the instant case, while the hearing record shows that the May 2011 CSE did not provide the student's mother with a copy of the resultant IEP at the time of the CSE meeting, the hearing record shows that the student's mother attended and participated in the May 2011 CSE meeting, and that the student's head teacher from McCarton, McCarton OT and speech-language providers, the McCarton upper school director, and a McCarton board certified behavior analyst (BCBA) participated in the CSE meeting by telephone (see Dist. Ex. 1 at p. 2). Furthermore, minutes from the CSE meeting reveal that the student's mother expressed her concerns regarding the student at the May 2011 CSE meeting (see Tr. pp. 603-05; see also Dist. Ex. 2 at p. 2). The hearing record further shows that the CSE was responsive to the concerns of the parent; for example, the parent was concerned that she did not have enough time to complete the vocational interview and the CSE agreed that the parent would take the interview home and mail it back to the CSE and that the CSE would use teacher information and develop draft transition goals, explaining that it was a "fluid" process and would be adjusted as the student's interests and skills develop (Dist. Ex. 2 at p. 2). Another example which shows responsiveness to the parent's concerns regarding the goals was that the parent indicated she wanted to add an articulation goal for clarity and a voice modulation to the IEP and the CSE added the goal (id.).

The student's mother testified that the CSE meeting lasted about two hours and that the student's academic deficits and needs were fully discussed, as were the student's related services

---

[9] I note that the parents do not claim that the district failed to provide them with a copy of the IEP before the start of the school year. Further, even assuming for the sake of argument that the district somehow improperly delayed delivery of the IEP, there is no evidence in the hearing record that such a delay impeded the student's right to a FAPE, significantly impeded the parents' meaningful participation in the CSE process, or caused a deprivation of educational benefits in this case (see 20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; A.H., 2010 WL 3242234, at *2; Application of the Dep't of Educ., Appeal No. 10-070).

needs, the annual goals and short-term objectives (Tr. pp. 599-601).  In addition, the student's mother testified that the student's behaviors were discussed at the CSE meeting, including the student's severe attention deficit, verbal perseveration, rigidity, and the strategies used by McCarton when preparing the student for change and controlling his outbursts (Tr. pp. 603-05). In addition, the hearing record reflects that the parent discussed at the CSE meeting the student's need for 1:1 instruction (Tr. p. 604).  Moreover, I note the testimony of the student's parent that when she received a copy of the May 2011 IEP at the end of June 2011, she "did not have any issues with the IEP itself" (Tr. p. 607); that she did not have a concern about the goals themselves, but was concerned about the particular school to which the student had been assigned and whether the goals could be achieved at the school (Tr. pp. 608-09).  In addition, I agree with the IHO that the district's social worker testified persuasively regarding the reasons that the CSE recommended a 6:1+1 program with related services for the student and the basis for the development of the goals in relation to the student's deficits and the BIP (see IHO Decision at p. 15; see also Tr. pp. 196-207; Dist. Ex. 2 at p. 2).

Based upon my review of the hearing record, I find that the parents were afforded an opportunity to meaningfully participate in the IEP development process (T.P., 554 F.3d at 253; see M.R., 615 F. Supp. 2d 294).

Next I will address the assertion by the parents that they were denied input or discussion as to the selection of the assigned school.  Generally, the IDEA requires parental participation in determining the educational placement of a student (see 34 CFR 300.116, 300.327, 300.501[c]; 501[b][1][i]).  The Second Circuit has established that "'educational placement' refers to the general educational program—such as the classes, individualized attention and additional services a child will receive—rather than the 'bricks and mortar' of the specific school" (T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 419-20 [2d Cir.2009], cert. denied, 130 S. Ct. 3277 [2010]; see A.L. v. New York City Dep't of Educ., 812 F. Supp. 2d 492, 504 [S.D.N.Y. 2011]; R.K. v. Dep't of Educ., 2011 WL 1131492, at *15-*17 [E.D.N.Y. Jan. 21, 2011], adopted at, 2011 WL 1131522 [E.D.N.Y. Mar. 28, 2011]; Concerned Parents & Citizens for the Continuing Educ. at Malcolm X Pub. Sch. 79 v. New York City Bd. of Educ., 629 F.2d 751, 756 [2d Cir. 1980]).  In T.Y., the student's IEP did not "name the school [the student] would attend," but rather, the parents received notice "in the mail that recommended a specific school placement" (T.Y., 584 F.3d at 416).  The parents visited the recommended site, but thereafter rejected it; the district recommended a second site, which the parents "called" but did not visit, and thereafter unilaterally placed the student in a nonpublic school (T.Y., 584 F.3d at 416).  Pointing to the IDEA and its implementing regulations, the parents argued in T.Y. that "'procedural safeguards . . . make clear that parents are to be afforded meaningful participation in the decision-making process as to the location and placement of their child's school and classroom'" (T.Y., 584 F.3d at 419).  The T.Y. court, however, relied upon precedent establishing that the "the term 'educational placement'" did not refer to the specific school, and expressly rejected the parents' argument (T.Y., 584 F.3d at 419-20).[10]

_____

[10] The United States Department of Education (USDOE) has clarified that a school district "may have two or more equally appropriate locations that meet the child's special education and related services needs and school administrators should have the flexibility to assign the child to a particular school or classroom, provided that determination is consistent with the decision of the group determining placement" (Placements, 71 Fed. Reg. 46588 [August 14, 2006]).

For the same reasons, the parents' argument on appeal must also be rejected because the parents' right to meaningfully participate in the educational placement process—that is, the development of the student's IEP—does not extend to the selection of the student's specific school building or classroom, which is the crux of the parents' arguments in this case (T.Y., 584 F.3d at 416, 419-20).[11]

In addition, although the district offered the parents the opportunity to visit the assigned school, neither the IDEA nor State regulations—as correctly argued by the district—confers upon parents the right to visit a recommended school and classroom.[12]  The U.S. Department of Education's Office of Special Education (OSEP) has opined that the IDEA does not provide a general entitlement to parents of students with disabilities to observe their children in any current classroom or proposed educational placement (Letter to Mamas, 42 IDELR 10 [OSEP 2004]; see Application of a Student with a Disability, Appeal No. 09-082; Application of the Dep't of Educ., Appeal No. 08-097; Application of a Child with a Disability, Appeal No. 07-049; Application of a Child with a Disability, Appeal No. 07-013).

Therefore, based upon the foregoing, the parents could not be deprived of the opportunity to participate in the selection of the student's specific school because neither the IDEA nor its implementing regulations entitles them to such right.

**B. May 2011 IEP**

**1. Special Factors and Interfering Behaviors**

Under the IDEA, a CSE may be required to consider special factors in the development of a student's IEP.  Among the special factors in the case of a student whose behavior impedes his or her learning or that of others, the CSE shall consider positive behavioral interventions and supports, and other strategies, to address that behavior (20 U.S.C. § 1414[d][3][B][i]; 34 CFR 300.324[a][2][i]; see 8 NYCRR 200.4[d][3][i]; see also E.H. v. Board of Educ., 2009 WL 3326627 [2d Cir. Oct. 16, 2009]; A.C., 553 F.3d at 172; J.A. v. East Ramapo Cent. Sch. Dist., 603 F. Supp. 2d 684, 689 [S.D.N.Y. 2009]; M.M., 583 F. Supp. 2d at 510; Tarlowe, 2008 WL 2736027, at *8; W.S., 454 F. Supp. 2d at 149-50; Application of a Student with a Disability, Appeal No. 09-101; Application of a Student with a Disability, Appeal No. 09-038; Application of a Student with a Disability, Appeal No. 08-028; Application of the Dep't of Educ., Appeal No. 07-120).  To the extent necessary to offer a student an appropriate educational program, an IEP

---

[11] Subsequent to the T.Y. decision, the Second Circuit found that the assignment of a particular school is an administrative decision, provided it is made in conformance with the CSE's educational placement recommendation (see K.L.A. v. Windham Southeast Supervisory Union, 2010 WL 1193082, at *2 [2d Cir. Mar. 30, 2010]; White v. Ascension Parish Sch. Bd., 343 F.3d 373, 379 [5th Cir. 2003]; see Veazey v. Ascension Parish Sch. Bd., 2005 WL 19496 [5th Cir. Jan. 5, 2005]; A.W. v. Fairfax Co. Sch. Bd., 372 F.3d 674, 682 [4th Cir. 2004]; Concerned Parents, 629 F.2d at 756; Tarlowe, 2008 WL 2736027, at *6; Application of the Dep't of Educ., Appeal No. 11-015; Application of a Student with a Disability, Appeal No. 09-082; Application of a Student with a Disability, Appeal No. 09-074; Application of a Student with a Disability, Appeal No. 09-063).

[12] Nothing in this decision, however, is intended to discourage districts from offering parents the opportunity to view school or classroom placements as such opportunities can only foster the collaborative process between parents and districts.  If parents visit a particular classroom and, at that point, have new concerns, the IDEA and the Education Law contemplate that the collaborative process for revising the IEP will continue—that the parents will ask to return to the CSE and share those concerns with the objective of improving the student's IEP.

must identify the supplementary aids and services to be provided to the student (20 U.S.C. § 1414[d][1][A][i][IV]; 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v][a], [b][3]; Piazza v. Florida Union Free Sch. Dist., 2011 WL 1458100, at *1 [S.D.N.Y. Apr. 7, 2011]; Gavrity v. New Lebanon Cent. Sch. Dist., 2009 WL 3164435, at *30 [N.D.N.Y. Sept. 29, 2009] [discussing the student's IEP which appropriately identified program modifications, accommodations, and supplementary aids and services]; P.K., 569 F. Supp. 2d at 380; see also Schreiber v. East Ramapo Central Sch. Dist., 700 F. Supp. 2d 529, 556 [S.D.N.Y. 2010] [noting that when defending a unilateral placement as appropriate under the IDEA, a parent in some circumstances may also be required to demonstrate that appropriate "supplementary aids and services" are provided to the student]).

In New York State, policy guidance explains that "the IEP must include a statement (under the applicable sections of the IEP) if the student needs a particular device or service (including an intervention, accommodation or other program modification) to address one or more of the following needs in order for the student to receive a [FAPE]" ("Guide to Quality Individualized Education Program [IEP] Development and Implementation," at p. 25, Office of Special Educ. [Dec. 2010], available at http://www.p12.nysed.gov/specialed/publications/iepguidance/IEPguideDec2010.pdf). "The behavioral interventions and/or supports should be indicated under the applicable section of the IEP," and if necessary, "[a] student's need for a [BIP] must be documented in the IEP" (id.).[13] State procedures for considering the special factor of a student's behavior that impedes his or her learning or that of others may also require that the CSE consider having an FBA conducted and a BIP developed for a student in certain non-disciplinary situations (8 NYCRR 200.4[d][3][i], 200.22[a], [b]). An FBA is defined in State regulations as "the process of determining why a student engages in behaviors that impede learning and how the student's behavior relates to the environment" and "include[s], but is not limited to, the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior (including cognitive and affective factors) and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it" (8 NYCRR 200.1[r]). According to State regulations, an FBA shall be based on multiple sources of data and must be based on more than the student's history of presenting problem behaviors (8 NYCRR 200.22[a][2]). An FBA must also include a baseline setting forth the "frequency, duration, intensity and/or latency across activities, settings, people and times of the day," so that a BIP (if required) may be developed "that addresses antecedent behaviors, reinforcing consequences of the behavior, recommendations for teaching alternative skills and behaviors and an assessment of student preferences for reinforcement" (8 NYCRR 200.22[a][3]). Although State regulations call for the procedure of using an FBA when developing a BIP, the failure to comply with this procedure does not automatically render a BIP deficient (A.H., 2010 WL 3242234).

---

[13] While the student's need for a BIP must be documented in the IEP, and prior to the development of the BIP, an FBA either "has [been] or will be conducted ("Guide to Quality Individualized Education Program [IEP] Development and Implementation," at p. 25 [emphasis in original]), it does not follow that in every circumstance an FBA must be conducted and a BIP developed at the same time as the IEP (see Cabouli v. Chappaqua Cent. Sch. Dist., 2006 WL 3102463 [2d Cir. Oct. 27, 2006] [noting that it may be appropriate to address a student's behaviors in an IEP by noting that an FBA and BIP will be developed after a student is enrolled at the proposed district placement]).

With regard to a BIP, the special factor procedures set forth in State regulations further note that the CSE or CPSE "shall consider the development of a [BIP] for a student with a disability when: (i) the student exhibits persistent behaviors that impede his or her learning or that of others, despite consistently implemented general school-wide or classroom-wide interventions; (ii) the student's behavior places the student or others at risk of harm or injury; (iii) the CSE or CPSE is considering more restrictive programs or placements as a result of the student's behavior; and/or (iv) as required pursuant to" 8 NYCRR 201.3 (8 NYCRR 200.22[b][1]). Once again, "[i]f a particular device or service, including an intervention, accommodation or other program modification is needed to address the student's behavior that impedes his or her learning or that of others, the IEP shall so indicate" (8 NYCRR 200.22[b][2]). If the CSE determines that a BIP is necessary for a student "the [BIP] shall identify: (i) the baseline measure of the problem behavior, including the frequency, duration, intensity and/or latency of the targeted behaviors . . . ; (ii) the intervention strategies to be used to alter antecedent events to prevent the occurrence of the behavior, teach individual alternative and adaptive behaviors to the student, and provide consequences for the targeted inappropriate behavior(s) and alternative acceptable behavior(s); and (iii) a schedule to measure the effectiveness of the interventions, including the frequency, duration and intensity of the targeted behaviors at scheduled intervals (8 NYCRR 200.22[b][4]).[14]   Neither the IDEA nor its implementing regulations require that the elements of a student's BIP be set forth in the student's IEP ("Student Needs Related to Special Factors," Office of Special Education [April 2011], available at http://www.p12.nysed.gov/specialed/formsnotices/IEP/training/QA-411.pdf). However, once a student's BIP is developed and implemented, "such plan shall be reviewed at least annually by the CSE or CPSE" (8 NYCRR 200.22[b][2]). Furthermore, "[t]he implementation of a student's [BIP] shall include regular progress monitoring of the frequency, duration and intensity of the behavioral interventions at scheduled intervals, as specified in the [BIP] and on the student's IEP. The results of the progress monitoring shall be documented and reported to the student's parents and to the CSE or CPSE and shall be considered in any determination to revise a student's [BIP] or IEP" (8 NYCRR 200.22[b][5]).

The hearing record reflects that the district did not conduct an FBA of the student (Tr. pp. 238, 643). I note that the student was attending McCarton at the time of the May 2011 CSE meeting and conducting an FBA to determine how the student's behavior related to that environment has diminished value where, as here, the CSE did not have the option of recommending that the student be placed at McCarton and was charged with identifying an appropriate publicly funded placement for the student (see 8 NYCRR 200.1[r]). However, the hearing record taken as a whole supports the IHO's conclusion that the district had obtained and considered information sufficient to identify the student's problem behaviors, the reasons why he engaged in the behaviors, and the strategies McCarton used to address the behaviors, which resulted in a sufficient BIP (IHO Decision at pp. 15-16; see C.F. v. New York City Dep't of Educ., 2011 WL 5130101, at *10 [S.D.N.Y. Oct. 28, 2011] [explaining that the absence of an FBA may not result in a denial of a FAPE]).

Testimony from the director of the McCarton upper school (director) indicates that the school assesses and measures the behaviors that interfere with the student's learning by using ABA techniques to "evaluate different conditions under which the behavior occurs, try to figure

---

[14] The Official Analysis of Comments to the federal regulations explains that the decision regarding whether a student requires interventions such as a BIP rests with the CSE and is made on an individual basis (Consideration of Special Factors, 71 Fed. Reg. 46683 [August 14, 2006]).

out what the function of this behavior is, develop a positive behavior support program and supportive alternatives, and try to give functionally related alternatives to the individual so they don't have to engage in that particular behavior set" (Tr. pp. 348-49). The district's social worker who participated in the May 2011 CSE meeting testified that the CSE reviewed documents prepared by McCarton, including a 2010-11 McCarton IEP and a September 2010 positive behavior support plan (behavior plan) (Tr. pp. 185, 188, 191-92; Dist. Exs. 9-11). According to the behavior plan, McCarton personnel identified and described the student's target behaviors as verbal perseveration (repeating the same questions or statements when they are already answered or acknowledged), and protest (noncompliance paired with yelling, banging objects and/or aggression to others) (Dist. Ex. 10). The behavior plan indicated possible setting events as instances when the student was "denied access," and that the possible function of the behaviors was an attempt to restore routines (id.). The director also identified the student's high rate of distractibility as interfering with his ability to learn (Tr. p. 351). Antecedent strategies included in the behavior plan designed to reduce the occurrence of the behaviors were having the student participate in creating and reviewing his schedule; presenting reminders of appropriate behaviors the student could use prior to known triggers; and having the teacher implement specific problem solving strategies during episodes of verbal perseveration, including when appropriate, acknowledging the student's concerns, reviewing schedule, rules, and contingencies, asking the student for possible solutions, and honoring the student's request (Dist. Ex. 10). The behavior plan also provided functional alternative behaviors to be reinforced, and consequences for both aggressive and verbal perseveration behaviors (id.).

The district's social worker testified that the May 2011 CSE engaged in a detailed discussion about the student's social/emotional and behavioral needs (Tr. pp. 201-02; Dist. Ex. 1 at p. 2; Parent Ex. JJ at p. 1). According to the social worker, the CSE discussed the student's need for predictability and notice prior to a change in routine to avoid eliciting resistant, defiant, physically aggressive, yelling, and object banging behaviors (Tr. pp. 202-04). The CSE also discussed the efficacy of the then-current behavior plan and McCarton's use of intentionally changing the student's routines to build coping skills (Tr. pp. 203-04). Strategies the CSE discussed to reduce the student's behaviors included providing him with advanced notice of changes, allowing him to make decisions, and providing positive reinforcement when he exhibited desirable behaviors (Tr. p. 204). Based on the discussion of the student's behaviors, the CSE determined that it was necessary to develop a BIP (Tr. pp. 204-05; Dist. Ex. 2 at pp. 2-3). The social worker testified that the CSE used the information discussed during the meeting, including the input of the student's McCarton teacher, the BCBA, and the behavior plan to draft the BIP (Tr. p. 205; Dist. Ex. 2 at pp. 2-3).

The district's BIP indicated that when confronted with denied access to preferred items, delayed responses to requests, or unplanned changes to his schedule, the student engaged in verbal protests (including noncompliance, yelling, banging objects and/or aggression toward others), and verbal perseverations (including continued repetition of the same question or statements once they have been answered/acknowledged) (Dist. Ex. 1 at pp. 6, 8, 29). The expected changes identified in the BIP were that the student would increase his attention to assigned classroom tasks and activities, and that he would reduce his verbal perseveration and verbal protest behaviors (id. at p. 29). The CSE identified strategies to change the student's behaviors including providing positive reinforcement throughout the day when the student exhibited appropriate behaviors (attending to instruction and classroom routines, activities, and assigned tasks) and peer/staff interactions (spontaneously interacting with others) (id.). Other

14

strategies included in the BIP were teaching the student appropriate ways to protest following trigger events, and providing redirection when he engaged in perseveration behaviors (id.). The BIP recommended the use of problem solving strategies such as acknowledging the student's frustration; reviewing the schedule, rules, and contingencies of his reinforcement schedule; asking the student for and/or proposing possible solutions; if appropriate, honoring the student's request for a change of task or short break; explaining why certain activities/preferred staff are unavailable; and explaining why his repeated request/question would not be answered (id.). The CSE identified the student's 1:1 behavior management paraprofessional, special education teacher, the classroom paraprofessional, and related service providers as supports to help the student change his behavior, as well as the need for collaboration between home and school (id.). According to the social worker, none of the CSE participants identified student behaviors that the BIP failed to address (Tr. pp. 205-06). The hearing record further shows that the May 2011 CSE obtained and discussed information about the student's behaviors from various sources, and developed a BIP commensurate with that information (compare Tr. pp. 201-06, and Dist. Ex. 10, with Dist. Ex. 1 at p. 29).

For all the reasons discussed above, I find that the hearing record in this instance supports the IHO's conclusion that the May 2011 BIP is sufficient (see IHO Decision at pp. 15-16).[15]

Additionally, I note that the May 2011 CSE and resulting IEP identified the student's needs for clear structure, routines and expectations, a multisensory approach, a positive reinforcement system to elicit desired behaviors, a visual schedule, written and verbal prompts/supports, visual representation and reinforcement, teacher prompts to refocus, and extra time for processing and responding (Dist. Ex. 1 at pp. 5, 7). The May 2011 IEP indicated that prior warnings, preparing, and rehearsing were needed for the student to successfully accept changes in routines or schedules (id. at pp. 6-7). Although the student engaged in ritualistic behaviors, the IEP noted that he was easily redirected by setting clear expectations or using simple reminders (id. at p. 6). Additionally, the IEP provided annual goals and short-term objectives to improve the student's ability to attend to classroom activities, decrease verbal perseveration and verbal protests, and increase his ability to "move on" to an appropriate topic with prompting and develop appropriate means of protesting and expressing himself (id. at p. 9). The IEP also included an annual goal designed to improve the student's use of coping strategies to handle frustration and problem solving skills (id. at p. 11; see Tr. pp. 191-93; see also Dist. Ex. 11). Thus, the hearing record shows that in conjunction with the BIP, the IEP provided additional supports to improve the student's behavior.

### 2. 6:1+1 with 1:1 paraprofessional services

To the extent that the parents contend that the recommended program in the May 2011 IEP would not have provided sufficient 1:1 instruction and behavioral support to meet the student's needs, as set forth below, the recommendation of a 6:1+1 special class in a specialized school combined with the provision of a 1:1 behavior management paraprofessional was appropriately designed to address the student's academic and social/emotional needs.

---

[15] To the extent that the parents allege on appeal that the BIP was prepared without their direct participation, the hearing record shows that the student's mother and participants from McCarton conducted a full discussion regarding the student's behavioral needs and the McCarton reports, and that the BIP was reviewed and amended during the CSE meeting (Tr. pp. 194-95, 201-06, 599, 603-05; Dist. Ex. 2 at pp. 2-3).

The hearing record shows that the May 2011 CSE considered placement of the student in both a special class in a community school with the services of a behavior management paraprofessional, and a classroom with more than six students, but determined those placements would not have been appropriate for the student as he required a "small highly structured class to address and support his overall learning and social-emotional needs" (Dist. Exs. 1 at p. 25; 2 at p. 2). State regulations provide that a 6:1+1 special class placement is designed to address students "whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention" (8 NYCRR 200.6[h][4][ii][a]). For the 2011-12 school year, the CSE recommended a 6:1+1 special class placement in a special school, which the social worker described as a placement for students with disabilities who require specialized instruction outside of the general education setting (Tr. pp. 195-96). The social worker indicated that 6:1+1 special class placements were typically very structured, and offered frequent opportunities for small group instruction, predictable routines, visual schedules, and behavior programs (Tr. p. 197).[16] According to the social worker, at the May 2011 CSE meeting, McCarton personnel agreed that the student required placement in a class with a small student-to-teacher ratio (Tr. p. 253).

The CSE also recommended that the student receive 1:1 behavior management paraprofessional services within the 6:1+1 special class to provide the student with additional support (Tr. pp. 195-97; Dist. Ex. 1 at pp. 6-7, 26, 29). The social worker testified that the CSE considered the student's program at McCarton, which emphasized 1:1 support, and believed providing 1:1 paraprofessional services to the student in the district's program would help ease his transition from the private school (Tr. pp. 210-11). According to the social worker, the 1:1 paraprofessional, under the supervision of the special education teacher, would be responsible in part for implementing the BIP (Tr. pp. 211, 238-39).

The social worker testified that the CSE determined the 6:1+1 special class placement recommendation after discussing the student's then-current program, his present levels of development, and the presentation of his behaviors (Tr. p. 235). She indicated that her understanding of the student's program at McCarton was that he was in a classroom consisting of a head teacher and support staff, which "parallel[ed]" the 6:1+1 special class placement with 1:1 behavior management paraprofessional services the district recommended (Tr. pp. 254, 268-69).

To the extent the parents argue on appeal that the assigned school did not offer the appropriate 1:1 instruction and behavioral support the student required, while an analysis of this issue would require me to determine what might have happened had the parents consented to the district's provision of special education services and the district been required to implement the student's IEP (see 20 U.S.C. § 1401[9][D]; 34 CFR 300.17[d]; see also 20 U.S.C. § 1414[d]; 34 CFR 300.320), a review of the hearing record supports a contrary conclusion. The special education teacher of the 6:1+1 special class at the assigned school testified that she provided 1:1 instruction to students in her class throughout the school day (Tr. pp. 95, 100, 102-03, 141, 155-56, 165-69). She stated that she personally devoted half of the school day to 1:1 instruction of students, and the amount of 1:1 instruction each student received was determined by their need for that service (Tr. pp. 102-03, 167-68). The special education teacher indicated that she was

---

[16] I note that the social worker who participated in the May 2011 CSE meeting is also a special education teacher and had previously taught students with autism (Tr. pp. 185-86, 188, 216).

responsible for the students' academic instruction, and the paraprofessionals whom she trained and supervised, were responsible for reinforcing her instruction (Tr. pp. 155-56). The hearing record shows that at McCarton, the student received 1:1 instruction, and instruction in a group of two students and in a small group with 1:1 support (Tr. pp. 347, 352, 354, 404-06, 449-50). The director testified that the support provided to the student in group settings was to help the student pay attention and sustain focus, similar to how the May 2011 CSE envisioned the 1:1 paraprofessional would assist the student (Tr. p. 352; Dist. Ex. 1 at pp. 5, 29).

As described above, the hearing record demonstrates the student required adult support to manage his behaviors that interfered with learning so he could benefit from both 1:1 and group instruction, which would have been provided in the district's recommended 6:1+1 special class placement with 1:1 paraprofessional services (see J.A. v. New York City Dep't of Educ., 2012 WL 1075843, *9-*10 [S.D.N.Y. Mar. 28, 2012] [resolving conflicting views over the quality and extent of adult support services that must provided to a student]).

### 3. Transitional Support Services

The parents also assert that the district failed to develop a transition plan for the student with respect to the student's transition from McCarton's ABA-based program to the district's TEACCH-based program. Although the IDEA does not require a "transition plan" as part of a student's IEP when a student moves from one school to another,[17] in the instant case, a review of the hearing record reflects that had the student attended the district placement, the district would nevertheless have offered the student specialized services to assist him in transitioning from McCarton to the district recommended class (see A.L., 812 F. Supp. 2d at 505; E.Z.-L. v. New York City Dep't of Educ., 763 F. Supp. 2d 492, 505 [S.D.N.Y. 2011]; see also M.S. v. New York City Dep't of Educ., 734 F. Supp. 2d 271, 280 [E.D.N.Y. 2010]). Here, the district's social worker testified that the 1:1 paraprofessional would help with the student's transition from McCarton to the district program (Tr. p. 211). In addition, the student's BIP provided strategies for addressing the student's needs for predictability (Tr. pp. 202-04; Dist. Ex. 1 at p. 29). Moreover, I note that the hearing record reflects that pre-warning and redirection were effective with the student (Tr. pp. 202-03, 547-48). Accordingly, the hearing record reflects that the district would have provided transition support in order to facilitate the student's placement in the assigned school.[18, 19]

---

[17] Under the IDEA, to the extent appropriate for each individual student, an IEP must focus on providing instruction and experiences that enables the student to prepare for later post-school activities, including postsecondary education, employment, and independent living (20 U.S.C. § 1401[34]; see Educ. Law § 4401[9]; 34 CFR 300.43; 8 NYCRR 200.1[fff] [defining "Transition Services"]). Accordingly, pursuant to federal law and State regulations, an IEP for a student who is at least 16 years of age (15 under State regulations) must include appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, if appropriate, independent living skills (20 U.S.C. § 1414[d][1][A][viii]; 34 CFR 300.320[b]; 8 NYCRR 200.4[d][2][ix]). It must also include the transition services needed to assist the student in reaching those goals (id.). Here, the student had not attained the age of 15 at the time of the CSE meeting (see Dist. Ex. 1 at p. 1).

[18] I note that the parents do not assert that the district failed to recommend transitional support services pursuant to State regulations governing the provision of educational services to students with autism. The particular State regulation requires that in instances when a student with autism has been "placed in programs containing students with other disabilities, or in a regular class placement, a special education teacher with a background in teaching students with autism shall provide transitional support services in order to assure that the student's special education needs are being met" (8 NYCRR 200.13[a][6]). Transitional support services are "temporary

### 4. Parent Counseling and Training

State regulations require that an IEP indicate the extent to which parent counseling and training will be provided to parents, when appropriate (8 NYCRR 200.4[d][2][v][b][5]). State regulations further provide for the provision of parent counseling and training for the purpose of enabling parents of students with autism to perform appropriate follow-up intervention activities at home (8 NYCRR 200.13[d]). Under State regulations, the definition of "related services" includes parent counseling and training (8 NYCRR 200.1[qq]). Parent counseling and training is defined as "assisting parents in understanding the special needs of their child; providing parents with information about child development; and helping parents to acquire the necessary skills that will allow them to support the implementation of their child's individualized education program" (8 NYCRR 200.1[kk]; see 34 CFR 300.34[c][8]). However, Courts have held that a failure to include parent counseling and training on an IEP does not constitute a denial of a FAPE where a district provided "comprehensive parent training component" that satisfied the requirements of the State regulation (see C.F., 2011 WL 5130101, at *10; M.N. v. New York City Dep't of Educ., 700 F. Supp. 2d 356, 368 [S.D.N.Y. Mar. 25, 2010]), or where the district was not unwilling to provide such services at a later date (see M.M., 583 F. Supp. 2d at 509; but c.f., P.K. v. New York City Dep't of Educ., 2011 WL 3625088, at *9 [E.D.N.Y. Mar. 2011], adopted at, 2011 WL 3625317 [E.D.N.Y. Aug. 15, 2011]; R.K., 2011 WL 1131492, at *21).[20]

In the instant case, although the provision of parent counseling and training was not set forth in the May 2011 IEP, the hearing record reflects that such services were available at the assigned school. The district's social worker testified that parent counseling and training were "programmatically embedded" in the district's program that was offered to the student. Additionally, the IHO found persuasive the testimony of the district's social worker that the parents were informed at the CSE review that parent counseling and training would have been provided, and the student's mother testified that she had been told that parent training would be offered at the assigned school (see IHO Decision at p. 17; see also Tr. pp. 209-10, 249-51, 630). In addition, I note that the district's teacher at the assigned school testified that parent training workshops were available at the school and that she provided individual parent counseling and training to the parents of students in her class (Tr. pp. 119-21, 161-62).

Given that parent counseling and training was available at the assigned school, I find under the circumstances of this case that the district's failure to incorporate parent counseling and

---

services, specified in a student's [IEP], provided to a regular or special education teacher to aid in the provision of appropriate services to a student with a disability transferring to a regular program or to a program or service in a less restrictive environment" (8 NYCRR 200.1[ddd]).

[19] In April 2011, the Office of Special Education issued an updated guidance document entitled "Questions and Answers on Individualized Education Program (IEP) Development, The State's Model IEP Form and Related Documents," which describes transitional support services for teachers and how they relate to a student's IEP (see http://www.p12.nysed.gov/specialed/formsnotices/IEP/training/QA-411.pdf).

[20] To the extent that P.K. or R.K. may be read to hold that the failure to adhere to the procedure of listing parent counseling and training on an IEP constitutes a per se, automatic denial of a FAPE, I note that Second Circuit authority does not appear to support application of such a broad rule (see A.C., 553 F.3d. at 172 citing Grim, 346 F.3d at 381 [noting that it does not follow that every procedural error renders an IEP inadequate]; see also Student X v. New York City Dep't of Educ., 2008 WL 4890440, at *16 [E.D.N.Y. Oct. 30, 2008]).

training into the May 2011 IEP did not result in any substantive harm, nor did it, in this case, rise to the level of a denial of a FAPE to the student (see C.F., 2011 WL 5130101, at *10; M.N., 700 F. Supp. 2d at 368; M.M., 583 F. Supp. 2d at 509).

In view of the foregoing evidence I find the parents' claims that the May 2011 IEP was inappropriate and thereby denied the student a FAPE must be dismissed.

### C. Assigned School

The parents allege errors regarding the class and school to which the student had been assigned. In this case, a meaningful analysis of the parents' claim with regard to the student's particular public school assignment would require me to determine what might have happened had the district been required to implement the student's IEP. While parents are not required to try out the school district's proposed program (Forest Grove, 129 S.Ct. at 2496), I note that neither the IDEA nor State regulations require a district to establish the manner in which a student will be grouped on his or her IEP, as it would be neither practical nor appropriate. The Second Circuit has also determined that, unlike an IEP, districts are not expressly required to provide parents with class profiles (Cerra, 427 F.3d at 194). The IDEA and State regulations provide parents with the opportunity to offer input in the development of a student's IEP, but they do not permit parents to direct through veto a district's efforts to implement each student's IEP (see T.Y., 584 F.3d at 420). A delay in implementing an otherwise appropriate IEP may form a basis for finding a denial of a FAPE only where the student is actually being educated under the plan, or would be, but for the delay in implementation (see E.H., 2008 WL 3930028, at *11 [N.D.N.Y. Aug. 21, 2008], aff'd 2009 WL 3326627 [2d Cir. Oct. 16, 2009]). The sufficiency of the district's offered program is to be determined on the basis of the IEP itself (see R.E. v. New York City Dept. of Educ., 785 F. Supp. 2d 28, 42 [S.D.N.Y. 2011]). If it becomes clear that the student will not be educated under the proposed IEP, there can be no denial of a FAPE due to the failure to implement it (id.; see also Grim, 346 F.3d at 381-82 [holding that the district was not liable for a denial of a FAPE where the challenged IEP was determined appropriate, but the parents chose not to avail themselves of the public school program]).

Once a parent consents to a district's provision of special education services, such services must be provided by the district in conformity with the student's IEP (20 U.S.C. § 1401[9][D]; 34 CFR 300.17[d]; see 20 U.S.C. § 1414[d]; 34 CFR 300.320). With regard to the implementation of a student's IEP, a denial of a FAPE occurs if the district deviates from substantial or significant provisions of the student's IEP in a material way and thereby precludes the student from the opportunity to receive educational benefits (A.P. v. Woodstock Bd. of Educ., 2010 WL 1049297 [2d Cir. March 23, 2010]; see Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811 [9th Cir. 2007]; Houston Independent School District v. Bobby R., 200 F.3d 341 at 349 [5th Cir. 2000]). In this case, the parents rejected the IEP and enrolled the student at McCarton prior to the time that the district became obligated to implement the student's IEP (see Dist. Ex. 22). Thus, the district was not required to establish that the student's IEP would have been implemented in accordance with State and Federal law in the proposed classroom. Even assuming for the sake of argument that the student had attended the district's recommended program, the evidence in the hearing record does not support the conclusion that the district would have deviated from the student's IEP in a material or substantial way (A.P., 2010 WL 1049297 [2d Cir. March 23, 2010]; Van Duyn, 502 F.3d at 822; see D.D.-S. v. Southold U.F.S.D., 2011 WL 3919040, at *13 [E.D.N.Y. Sept. 2, 2011]; A.L., 812 F. Supp. 2d 492, 502).

## 1. Assigned Class – Grouping

With regard to the parents' claim related to grouping the student at the public school site, State regulations require that in special classes, students must be suitably grouped for instructional purposes with other students having similar individual needs (8 NYCRR 200.1[ww][3][ii], 200.6[a][3], [h][3]; see Walczak, 142 F.3d at 133 [approving an IEP that placed a student in a classroom with students of different intellectual, social, and behavioral needs, where sufficient similarities existed]; Application of a Student with a Disability, Appeal No. 09-082; Application of the Dep't of Educ., Appeal No. 08-095; Application of the Dep't of Educ., Appeal No. 08-018; Application of a Child with a Disability, Appeal No. 07-068; Application of a Child with a Disability, Appeal No. 05-102). State regulations further provide that determinations regarding the size and composition of a special class shall be based on the similarity of the individual needs of the students according to: levels of academic or educational achievement and learning characteristics; levels of social development; levels of physical development; and the management needs of the students in the classroom (8 NYCRR 200.6[h][2]; see 8 NYCRR 200.1[ww][3][i][a]-[d]). The social and physical levels of development of the individual students shall be considered to ensure beneficial growth to each student, although neither should be a sole basis for determining placement (8 NYCRR 200.6[a][3][ii], [iii]). Further, the management needs of students may vary and the modifications, adaptations and other resources are to be provided to students so that they do not detract from the opportunities of the other students in the class (8 NYCRR 200.6[a][3][iv]). State regulations also require that a "district operating a special class wherein the range of achievement levels in reading and mathematics exceeds three years shall, . . . , provide the [CSE] and the parents and teacher of students in such class a description of the range of achievement in reading and mathematics, . . . , in the class, by November 1st of each year" (8 NYCRR 200.6[g][7]). However, State regulations do not preclude a grouping of students in a classroom when the range of achievement levels in reading and math would exceed three years (see Application of the Dep't of Educ., Appeal No. 08-018; Application of the Bd. of Educ., Appeal No. 06-010; Application of a Child with a Disability, Appeal No. 01-073).

In this case, the special education teacher at the assigned school testified that as of the first day of the extended school year (ESY) program in July 2011, her classroom was composed of five students who were classified as students with autism (Tr. p. 98).[21]  Regarding the students' levels in reading, writing and mathematics skills, one student was at a kindergarten level, one student was at a sixth grade level, and the remainder of the students exhibited skills at

---

[21] The parents raise on appeal that the chronological age range of the students in the classroom at the assigned school exceeded the regulatory 36 month maximum, because although as of the first day of the summer program the students were 11 to 14 years of age, had the student attended the assigned school, he subsequently turned 15 years old during the course of the summer. This issue was not raised in the parents' due process complaint notice or by the IHO and I decline to address it in this decision (see 20 U.S.C. § 1415[c][2][E][i][II], [f][3][B]; 34 CFR 300.507[d][3][i], [ii], 300.511[d]; 8 NYCRR 200.5[i][7][b], [j][1][ii]); see also B.P. v. New York City Dep't of Educ., 2012 WL 33984, at *4-*5 [E.D.N.Y. Jan. 6, 2012]; M.R. v. South Orangetown Cent. Sch. Dist., 2011 WL 6307563, at *12-*13 [S.D.N.Y. Dec. 16, 2011]; C.D. v. Bedford Cent. Sch. Dist., 2011 WL 4914722, at *13 [S.D.N.Y. Sept. 22, 2011] R.B. v. Dep't of Educ. of The City of New York, 2011 WL 4375694, at *6-*7 [S.D.N.Y. Sept. 16, 2011]; M.P.G., 2010 WL 3398256, at *8; Snyder v. Montgomery County, Pub. Sch., 2009 WL 3246579, at *7 [D. Md. Sept. 29, 2009]; Saki v. Hawaii, 2008 WL 1912442, at *6-7 [D. Hawaii Apr. 30, 2008]; Application of the Dep't of Educ., Appeal No. 10-070; Application of a Student with a Disability, Appeal No. 09-140).

grade levels similar to the student (Tr. pp. 99-100, 179-81). During academic instruction, students were placed into "homogeneous" groups based upon academic skill levels, and the special education teacher testified that had the student attended her class, for instructional purposes he would have been placed in a group with three other students whose academic skills were between a second and third grade level (Tr. pp. 99-100, 179; see Dist. Ex. 1 at p. 4). According to the student's May 2011 IEP, the student exhibited academic skills between the first and second grade levels (Dist. Ex. 1 at pp. 4-5). I note that the hearing record contains only information about the ESY class composition, and that the IHO determined that the district was not required to defend classroom composition for the portion of the 2011-12 school year beginning in September 2011 because the student did not attend the program, and I find no reason to disturb the IHO's determination on this issue (IHO Decision at p. 21; see Tr. pp. 112-14). Accordingly, upon review of the hearing record, I find that the evidence indicates that the district was capable of implementing the student's IEP with suitable grouping for instructional purposes in the 6:1+1 special class at the assigned district school for the ESY program beginning July 2011.

### 2. Provision of Related Service Mandates

The parents also assert that the district's assigned school would not have been able to provide the student with all of his mandated related services on the IEP. I agree with the IHO that the hearing record supports a finding that the district was capable of providing the student with his mandated related services. Although the assistant principal of the assigned school testified that during the 2011-12 school year, the school had a shortage of OT providers, I note that the testimony further indicated that RSA letters were provided to the parents (Tr. p. 47).

A June 2, 2010 "Q and A document" issued by the State Education Department to district superintendents clarifies that it is permissible for a school district to contract for the provision of special education related services in limited circumstances and with qualified individuals over whom the district has supervisory control. According to the document:

> [S]chool districts also have obligations under the IDEA and Article 89 of the Education Law to deliver the services necessary to ensure that students with disabilities receive FAPE. The Department recognizes that there will be situations in which school districts will not be able to deliver FAPE to students with disabilities without contracting with independent contractors. Where a school district is unable to provide the related services on a student's individualized education program ("IEP") in a timely manner through its employees because of shortages of qualified staff or the need to deliver a related service that requires specialized expertise not available from school district employees, the board of education has authority under Education Law §§1604(30), 1709(33), 2503(3), 2554(15)(a) and 4402(2)(b) to enter into contracts with qualified individuals as employees or independent contractors to provide those related services (see also §§1804[1], 1805, 1903[1], 2503[1], 2554[1]).

(http://www.emsc.nysed.gov/resources/contractsforinstruction/qa.html, Question 5; see http://www.emsc.nysed.gov/resources/contractsforinstruction/).

Moreover, case law supports a finding that data indicating that a school has not always delivered full special education services to its students does not mean that the school would have been unable to provide the services to another student whose IEP is being challenged in a due process proceeding (see M.S, 734 F. Supp. 2d 271 at 278-79). Therefore, even if the district had needed to provide the student with an RSA for related services, this would not have denied the student a FAPE.

### 3. Teaching Methodology

The parents allege that the teaching methodology used in the district's 6:1+1 special class was not appropriate for the student. Although an IEP must provide for specialized instruction in a student's areas of need, generally, a CSE is not required to specify methodology on an IEP, and the precise teaching methodology to be used by a student's teacher is usually a matter to be left to the teacher (Rowley, 458 U.S. at 204; M.M. v. Sch. Bd. of Miami-Dade County, 437 F.3d 1085, 1102 [11th Cir. 2006]; Lachman v. Illinois State Bd. of Educ., 852 F.2d 290, 297 [7th Cir. 1988]; A.S. v New York City Dep't of Educ., 10-cv-00009 [E.D.N.Y. May 26, 2011] [noting the "broad methodological latitude" conferred by the IDEA]; Application of a Student with a Disability, Appeal No. 12-017; Application of the Dep't of Educ., Appeal No. 11-133; Application of a Student with a Disability, Appeal No. 11-089; Application of the Bd. of Educ., Appeal No. 11-058; Application of the Bd. of Educ., Appeal No. 11-007; Application of a Student with a Disability, Appeal No. 10-056; Application of a Student with a Disability, Appeal No. 09-092; Application of the Dep't of Educ., Appeal No. 08-075; Application of a Child with a Disability, Appeal No. 07-065; Application of a Child with a Disability, Appeal No. 07-054; Application of a Child with a Disability, Appeal No. 07-052; Application of a Child with a Disability, Appeal No. 06-022; Application of a Child with a Disability, Appeal No. 05-053; Application of a Child with a Disability, Appeal No. 94-26; Application of a Child with a Disability, Appeal No. 93-46).

In this case, I find the parents' assertions regarding classroom methodology unpersuasive. The special education teacher at the assigned school testified that she had training in both ABA and TEACCH methods, which she incorporated into her classroom instruction (Tr. pp. 96-97, 103-10). Regarding ABA techniques, she described how tasks were broken down into specific components and indicated that staff documented student progress toward each item on a data collection form (Tr. pp. 106-07, 122-23). The special education teacher testified that she provided students with 1:1 discrete trial instruction (Tr. pp. 150-51, 162-63). According to the special education teacher, data collection and graphing occurred daily, and was reviewed weekly with the "team" and the assigned school's autism coach to determine whether the student was progressing toward a specific goal or whether the goal needed to be modified (Tr. pp. 106-07, 151-53). Students in the assigned school class also used a token reinforcement system and a "first/then chart" to reward positive behavior (Tr. pp. 107-10, 124-27).

When discussing the use of both ABA and TEACCH methods in the classroom, the special education teacher testified that students were provided with 1:1 instruction to acquire a new skill, and upon mastery, moved to a work station to continue working on that skill independently (Tr. pp. 102-03, 147-48). Other strategies used by the special education teacher included individual visual schedules, repetition, prompting and prompt fading, structure, individual schedules, breaks, and sensory input, techniques the May 2011 CSE recommended for the student (Tr. pp. 104-05, 117-18, 122, 252; Dist. Ex. 1 at pp. 5-7, 29). While the student's

mother testified that the student had previously received instruction using TEACCH methods and that it "didn't work for him," I note that TEACCH methods had not been attempted with the student since 2004 when he began attending McCarton (Tr. pp. 586-87, 629). As described above, the assigned school did not rely solely on TEACCH methods to instruct students, rather, it also incorporated many ABA teaching techniques that according to the student's mother, was the only method by which the student has shown meaningful progress (Tr. p. 586). Additionally, as stated above, the May 2011 CSE recommended 1:1 behavior management paraprofessional services in part to assist the student in the transition from McCarton to the assigned school placement (Tr. p. 260).

Accordingly, I find that the hearing record does not support a conclusion that the teaching methodologies utilized in the assigned classroom were not appropriate for the student.

### 4. Sensory Equipment

The parent also alleges that the assigned school lacked necessary sensory equipment to meet the student's needs. While an analysis of this issue would again require me to determine what might have happened had the parents consented to the district's provision of special education services and the district been required to implement the student's IEP (see 20 U.S.C. § 1401[9][D]; 34 CFR 300.17[d]; see 20 U.S.C. § 1414[d]; 34 CFR 300.320), I note that the hearing record shows that the student's primary motor needs were deficits in gross motor coordination and fine motor skills (Tr. pp. 436-37; Dist. Ex. 15). In the area of sensory processing, the McCarton occupational therapists recommended annual goals for the student to improve his ability to attend to and complete table top activities with verbal cues, and engage in gross motor and sensory based activities with verbal cues (Dist. Ex. 15 at p. 3). While the director of the OT department at McCarton testified that in general the school provides OT sessions in a "specialized sensory gym," the hearing record does not indicate that the student received his OT services in the sensory gym, or that he exhibited sensory needs to the extent that he required services provided in a sensory gym with specialized equipment (Tr. pp. 432-33, 436-37; see Tr. pp. 437-44; see Dist. Ex. 15).

The assistant principal of the assigned school testified that the school provided balls, a trampoline, and a treadmill (Tr. pp. 458, 490-91). The special education teacher at the assigned school testified that her classroom provided a sensory area with materials such as weighted vests, brushes, and headphones (Tr. pp. 103-04). She further testified that she uses a vocational assessment and student inventory for parents to identify sensory items specific to their child's needs, which she then obtains (id.). Although I can understand that the parent may have preferred a school with sensory equipment more similar to the sensory equipment available at McCarton, the hearing record does not support a finding that had the student attended the assigned school, the district was obligated to provide the same equipment that the private school provided or that the district was incapable of addressing the student's sensory needs sufficiently to enable him to receive educational benefits. The IEP in this case was personalized to address the student's needs and the district was not required to maximize the student's potential (A.C., 553 F.3d at 173; T.L. v. Dep't of Educ. of City of New York, 2012 WL 1107652, at *15 [E.D.N.Y. Mar. 30, 2012]). The district was not required to guarantee a specific level of benefit to the student and instead was required to offer an IEP that was designed to offer the opportunity for greater than trivial advancement (A.C., 553 F.3d at 173; Cerra, 427 F.3d at 195; Walczak, 142 F.3d at 130; Connor v. New York City Dep't of Educ., 2009 WL 3335760, at *5-*6

[S.D.N.Y. 2009]).  Assuming for the sake of argument that the student had attended the public school and that the district had the obligation to show that it implemented the IEP, the evidence does not support the conclusion that the district would have deviated from the student's IEP in a material or substantial way (A.P., 2010 WL 1049297; Van Duyn, 502 F.3d at 822; see T.L., 2012 WL 1107652, at *14; D.D.-S. v. Southold U.F.S.D., 2011 WL 3919040, at *13 [E.D.N.Y. Sept. 2, 2011]; A.L., 812 F. Supp. 2d at 502-03].

**VII. Conclusion**

In summary, I find that after a thorough review of the hearing record and due consideration, there is no reason to disturb the finding of the IHO that the district met its burden to show that it offered the student a FAPE for the 2011-12 school year.  Having determined that the district offered the student a FAPE for the 2011-12 school year, it is not necessary to reach the issue of whether McCarton was appropriate for the student or whether equitable considerations support the parents' claim and the necessary inquiry is at an end (M.C. v. Voluntown, 226 F.3d 60, 66 [2d Cir. 2000]; Walczak, 142 F.3d at 134; C.F., 2011 WL 5130101, at *12; D.D.-S., 2011 WL 3919040, at *13; Application of a Child with a Disability, Appeal No. 08-158; Application of a Child with a Disability, Appeal No. 05-038).  I have also considered the parties' remaining contentions and find that they are unnecessary to address in light of my determinations herein or lack merit.

**THE APPEAL IS DISMISSED.**

Dated:        Albany, New York
              May 4 , 2012

                                        JUSTYN P. BATES